**RECEIVED**

DEC 1 7 2021

CLERK, U.S. DISTRICT COURT
~~ST. PAUL, MINNESOTA~~

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

**Michael J. Harvey**
**(SSA # 3FT6-GWO-RG70)**

Plaintiff(s),

vs.

Case No.  21-cv-2693 ECT/KMM
(To be assigned by Clerk of District Court)

**Department of Health and Human Services**
**Xavier Becerra, Sec. for DHHS**
**300 Independence Avenue S.W.**
**Washington, D.C   20201**

DEMAND FOR JURY TRIAL

YES ☑        NO ☐

Defendant(s).

(Enter the full name(s) of ALL defendants in
this lawsuit.  Please attach additional sheets
if necessary).

## **COMPLAINT**

PARTIES

1. List your name, address and telephone number.  Do the same for any additional plaintiffs.

    a.  Plaintiff

| | |
|---|---|
| Name | **Michael J. Harvey** |
| Street Address | **2520 County Road F., East, #206** |
| County, City | **Ramsey County, Saint Paul** |
| State & Zip Code | **Minnesota   55110** |
| Telephone Number | **651-426-2761** |

**SCANNED**
DEC 1 7 2021
U.S. DISTRICT COURT ST. PAUL

2. List all defendants.  You should state the full name of the defendant, even if that defendant is a government agency, an organization, a corporation, or an individual.  Include the address where each defendant may be served.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.

   a. Defendant No. 1

      Name            **Department of Health and Human Services; Xavier Becerra, Sec.**

      Street Address     **200 Independence Avenue S.W.**

      County, City       **Washington**

      State & Zip Code   **District of Columbia    20201**

   b. Defendant No. 2

      Name

      Street Address

      County, City

      State & Zip Code

   c. Defendant No. 3

      Name

      Street Address

      County, City

      State & Zip Code

**NOTE: IF THERE ARE ADDITIONAL PLAINTIFFS OR DEFENDANTS, PLEASE PROVIDE THEIR NAMES AND ADDRESSES ON A SEPARATE SHEET OF PAPER.**
**Check here if additional sheets of paper are attached:** ☐
**Please label the attached sheets of paper to correspond to the appropriate numbered paragraph above (e.g. Additional Defendants 2.d., 2.e., etc.)**

JURISDICTION

Federal courts are courts of limited jurisdiction. Generally, two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount of damages is more than $75,000 is a diversity of citizenship case.

3. What is the basis for federal court jurisdiction? *(check all that apply)*

   ☑ Federal Question        ☐ Diversity of Citizenship

4. If the basis for jurisdiction is Federal Question, which Federal Constitutional, statutory or treaty right is at issue? List all that apply.

   **Please see attached Statutes in Complaint.**

5. If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party? Each Plaintiff must be diverse from each Defendant for diversity jurisdiction.

   Plaintiff Name:                    State of Citizenship:

   Defendant No. 1:                   State of Citizenship:

   Defendant No. 2:                   State of Citizenship:

   **Attach additional sheets of paper as necessary and label this information as paragraph 5.**
   **Check here if additional sheets of paper are attached.** ☐

6. What is the basis for venue in the District of Minnesota? *(check all that apply)*

   ☑ Defendant(s) reside in Minnesota   ☑ Facts alleged below primarily occurred in Minnesota

   ☐ Other: explain

STATEMENT OF THE CLAIM

Describe in the space provided below the basic facts of your claim. The description of facts should include a specific explanation of how, where, and when each of the defendants named in the caption violated the law, and how you were harmed. Each paragraph must be numbered

separately, beginning with number 7.  Please write each single set of circumstances in a separately numbered paragraph.

7.

**Please see attached Statement of the Claim.**

**Attach additional sheets of paper as necessary.**
**Check here if additional sheets of paper are attached:** ☑
**Please label the attached sheets of paper to as Additional Facts and continue to number the paragraphs consecutively.**


REQUEST FOR RELIEF

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking.


**Please see attached Request for Relief.**

Signed this _17th_ day of _December 2021_

Signature of Plaintiff _____

Mailing Address

**Michael Harvey**
**2520 County Road F, East, #206**
**Saint Paul, MN 55110**

Telephone Number   **651-426-2761**

Note:   All plaintiffs named in the caption of the complaint must date and sign the complaint and provide his/her mailing address and telephone number.  Attach additional sheets of paper as necessary.

## <u>List of Statutes Applicable to Jurisdiction of Complaint</u>

375 False Claims Act;

865 RSI (405(g))/42 U.S.C. paragraph 405 (Fraud);

Social Security Act, Section 1837(h); See also Program Operations Manual Systems, Hospital Insurance 00805.170 (POMS HI);

The Debt Collection Improvement Act of 1996, Section 31001, Chap. 10 (3)(A)(i-ii).

## Request for Relief

I seek a judgment by the District Court overturning the decision of the Administrative Law Judge for Medicare (dated June 28, 2019) concerning my request for reimbursement of $1221.96 for alleged overpayments of Medicare Part B premiums and additional relief in the sum of $10,000 for costs associated with my initial appeal (ALJ Appeal No. 1-8022619361). In addition, I request that the start date for my Medicare Part B Coverage be reinstated as 2013.

Included in this request, is a request for compensation for the time, costs, aggravation, and insult consequent upon the actions of SSA, Medicare, and in particular, the Medicare Appeals Council. My pursuit of fair and just treatment from SSA and Medicare in this matter required years of work, worry, and frustration; an enormous amount of record keeping, correspondence, travel, argumentation, analysis, research, and postage. All these factors contributed to personal, psychological, financial, and opportunity costs. Over the past five years, the period this dispute has taken place (thus far), has stolen time, peace of mind, and resources from other essential rights and needs for my life and well-being.

Finally, I ask the District Court to overturn the decision of the Administrative Appeals Judge for the Medicare Appeals Council upholding the decision of the Administrative Law Judge dated October 18, 2021 (Docket No. M-19-2771). In this instance I request additional relief in the amount of $90,000. The amount of $1221.96 for alleged overpayments of Medicare Part B premiums is relatively insignificant. The additional amounts of $10, 000 and $90,000 are requested first as penalty for the SSA's and Medicare's illegal, fraudulent, deceptive, erroneous, misrepresentative, harassing, prejudicial, manipulative, and corrupt conduct in their handling of the cancellation of my Medicare Part B account (SSA No. 3FT6-GWO-RG70)—and the illegal confiscation of my benefits. As a consequence of its conduct the SSA must suffer pain more than sufficient to deter altogether any recurrence of the ignoble and destructive acts it has committed in this case. If such discouraging deterrence is not enforced, the SSA will continue to victimize the citizens it was created to secure.

My father fought in World War II. He received both a Purple Heart and the Silver Star from Gen. Dwight D. Eisenhower. While a prisoner of war he died in North Korea. He died for this country. Every day I suffer his loss. The SSA has insulted and betrayed Master Sergeant William R. Harvey's heroic actions, his mortal sacrifice, his enduring honor.

## Complaint: Statement of the Claim

7. The following is an elaboration of my Complaint. As the issue in question is the validity and legality of the decision of the Administrative Law Judge, Kevin M. McCormick, for the Medicare Appeals Council, I start by evaluating this opinion. Date of the ALJ Decision: June 28, 2019 (Received July 3, 2019).

8. Appellant: Michael Harvey (SSA #3FT6-GWO-RG70)

9. OMHA Appeal Number: 1-8022619361

10. Docket Number: M-19-2771

11. I request review of the unfavorable decision of Kevin M. McCormick, Administrative Law Judge (ALJ hereafter) for OMHA, on my appeal of determinations by SSA and CMS regarding my Medicare Part B insurance entitlement date and the premiums associated with it. In this statement I will demonstrate conclusively that in his assessment of the record Judge McCormick has made errors of fact, law, and judicial conduct. As evidence I will rely primarily upon information present in the record. In addition, I will argue that SSA/CMS have failed to produce relevant information, without explanation, and thus violated the OMHA rules established for the adjudication of appeals. I will show that the record establishes indisputably that SSA/CMS violated my rights through inaction, misrepresentation, error, and illegal confiscation of funds. The SSA's incompetence, prejudice, deliberate obfuscation, and illegal conduct unnecessarily deprived my family and me of peace of mind, money, time, and personal freedom over a period of more than three years.

12. My statement here has five parts: 1)a review of the ALJ's findings of fact; 2)an examination of the ALJ's Analysis of the case; 3)my statement on the relief I have

requested; and 4)a brief presentation of special problems present in this case; and
5)concluding remarks.

13. It may seem odd that I provide a detailed, critical summary of the ALJ's Findings of Fact.
But I have several reasons for doing so. First, and foremost, I take exception to many of
the ALJ's representations of the facts. To explain my objections I have to point to specific
passages in the documents or other circumstances relevant to assessing the facts and/or
the ALJ's description of them. Second, I believe that by reviewing the Findings of Fact in
the chronological order by which the ALJ presents them will give you insight into the ebb
and flow in the development of this dispute. You will be better prepared to appreciate and
evaluate the immediate impact at particular moments or the cumulative effects over the
course of weeks, or months, that the words and actions of the SSA had on me. I
especially hope to impart an accurate impression of the spiraling confusion and
exasperation I felt at the uncooperative, uncomprehending, and procrastinating
declarations of the SSA. I wanted to solve the problem as efficiently and cleanly as
possible. In my judgment the SSA aimed, at virtually every juncture, to complicate
and/or confuse the situation and to frustrate and/or obstruct the path to a resolution.
Retracing the development of the conflict from both points of view as events unfolded
will enable you to assess with greater acuity each party's efforts and conduct. Another
reason for a protracted examination of the Findings of Fact is that it will enable me to
object clearly and precisely to many of the ALJ's determinations of fact and to explain the
problematic features of those items.

14. My aim throughout this document is to argue as clearly and directly as possible that this
problem could and should have been avoided. The SSA could, perhaps, have done more
to obstruct a solution, but it is difficult to see how. The SSA's conduct throughout the
process of seeking a resolution to what began as a simple, easily correctable error has
been offensive, counterproductive, and an extremely depressing example of a

bureaucracy incapable of effective, honest communication within itself and with the people it exists to serve.

### 15. Findings of Fact by the ALJ

16. The first five items of the ALJ's Findings of Fact summarize the history of my dealings with the SSA prior to the dispute that began at the end of 2016. So I will begin with Item #6 and the origins of the problem.

17. Item #6: "On November 28, 2016, the Appellant received a $667.40 bill from SSA, including $265.40 for Part B premiums for the period of October to December 2016, and $402.00 for Part B premiums for the period of January to March 2017 ($134/month x 3 months) (Exh. 2, pp. 3-4)."

18. While the ALJ includes a copy of the bill (Exh. 2, p. 4), he fails to note that the copy provided is notated in pen with the date "12/17/16"; the amount of payment, "$350"; and the printed phrase "charged to Discover". The payment was mailed on 12/18/16, seven days before the payment was due—and eleven days before the SSA claims it was received and recorded. You may know that delivery standards for the US Postal Service mandate delivery of first class mail no longer than three days from the day when the USPS receives it.

19. As noted on Exhibit 2, page 4, I mailed my Discover Card payment on 12/18/16. The SSA claims that the payment was not received until 12/29/16. Yet my statement for this period from Discover shows that payment was tendered to the SSA on 12/28/16. Why did it take from December 18, 2016, until December 29, 2016, for the SSA to receive, process, and record my payment?

20. Christmas in 2016 fell on a Sunday, which made 12/26/16 a Federal holiday, so government offices were closed. SSA's delay in recording my payment and led the agency to erroneously terminate my Part B coverage. Why was SSA in such a hurry to terminate my Part B coverage?

21. **Item #7**: "On December 28, 2016, the SSA advised the Appellant that he had not timely paid the Part B premium amount of $399.40 [*sic*—the total billing was for 667.40; the total due for the period from October through December was $265.40, and the remainder, $402.00, is for the period January through March 2017] and his last month of Part B coverage was December 2016 (Exh. 1, pp. 35-7)."

22. The ALJ is correct in recording as fact that this erroneous and misleading notice was dated December 28, 2016. I received it on January 3, 2017. However, he fails to note that the amount actually due for premiums covering the period from October through December was only $265.40 (see Item #6, the SSA's bill dated November 28, 2016; Exh. 2, pp. 3-4). The $402.00 above that amount was the premium due for the period from January through March 2017. Also, my payment of $350 in December included $84.60 toward the premium due for January. The SSA's false and misleading claim for the amount due in the December 28, 2016, letter was far in excess of the actual amount due, and this misinformation from the SSA contributed to my confusion.

23. The SSA's December 28, 2016, letter raises another problem. The SSA claimed in it that I had not made my payment. When I received my statement from Discover for December 2016, it showed that my $350 payment for Government Services had a transaction date of December 28, 2016, and a posting date of December 28, 2016. So my payment was received and paid on the day that the SSA sent its letter. Also, if Discover has the payment as posted on December 28, 2016, why didn't the SSA post it on the same date?

24. Please look again at the SSA's bill dated November 28, 2016. It states, "To ensure timely processing, payments must be received by December 25, 2016." December is an especially busy time of year for everyone. The twenty-fifth of December is, as you know, Christmas Day, and in 2016 it fell on a Sunday. Most likely the SSA did little or no business on the preceding Saturday, Christmas Eve. Also, since the holiday fell on a Sunday in 2016, on Monday, December 26, the Federal Government was also closed for business. Why did SSA choose the biggest national holiday of the year as the deadline? A

day on which no mail delivery occurs. Following a long holiday weekend, mail delivery, always heavy at Christmas, would have been even greater on December 27, the first day of business following what was essentially a three day holiday. Why didn't someone at the SSA take these facts into account? Also, all things considered, it's perplexing and a bit improbable that delivery of my payment, even at Christmas took ten days. How quickly, or slowly, did the SSA process payments in December of 2016? Why should I be penalized for the SSA's failure to process timely payments efficiently?

25. Why didn't the SSA, before sending out a letter notifying me that my Part B coverage would end on 12/31/16 check to make sure whether or not the payment had been received and paid? The SSA's failure to do so created this entire problem. Had it employed conventional, reasonable, and responsible business practices, both the SSA and I would have been spared enormous frustration, effort, and expense. But the SSA failed to do so. Yet, the ALJ's concise comment provides only facts from the SSA's perspective and none from mine.

26. Moreover, the SSA's letter of December 28, 2016 caused me to believe that my Part B coverage had been terminated. In sum, SSA's errors caused me to be misinformed about the status of my Part B coverage. The SSA failed to explain to me the actual events of December and the state of my Part B coverage until its untimely response on April 4, 2017 (Exh. 1, pp. 22-4) to my February 21, 2017 Request for Reconsideration (Exh. 2, pp. 1-2). I will address in detail those problems in their chronological order.

27. **Item #8**: "On January 10, 2017, the SSA advised the Appellant that his monthly premium for Part B was $121.80 beginning January 2016, and $134.00 starting January 2017 (Exh. 1, pp. 32-34)." This letter only repeated information that was provided in the bill dated November 28, 2016. I had hoped for a message informing me that the SSA had received my December payment and that my Part B coverage was continuing. SSA's failure to provide timely clarification of my status increasingly justified my belief that I did not have Part B coverage.

28. **Item #9**: "On February 21, 2017, the Appellant filed a request for reconsideration for denial of medical coverage. (Exh. 1, p. 31)."

29. The Exhibit cited is the SSA's official request form SSA-561-U2. I attached a letter of explanation in support of my request; see Exh. 2, pp. 1-2.

30. My letter is dated February 21, 2017. I had hoped that the confusion over my payment and coverage would be solved in a timely manner. But the sixty-day deadline to submit a Request for Reconsideration was approaching, so I felt I had to object. I explained that I had made a $350 payment in December and that my credit card statement indicated that the payment had been processed on December 28. I objected that, based on the SSA's letter of December 28, my Part B coverage had been unjustifiably terminated. I wrote: " . . . you have taken my payment yet denied me coverage."

31. I also informed the SSA that despite two letters informing me that I would receive a new insurance card (December 28, 2016, and January 10, 2017), I did not receive a new Medicare card within four weeks of either letter. The SSA's December 28 letter stated: "We will send you a new health insurance card . . . [new paragraph] If you do not get your Medicare card within four weeks after you receive this letter, please contact us." The SSA's January 10, 2017 letter repeated this assurance. This misrepresentation by SSA further confirmed my belief that I no longer had Part B coverage.

32. I explicitly stated: "In this second letter, no reference is made to the letter of December 28, 2016; nor to the stoppage of my health insurance coverage; nor to the payment your office received and accepted from me on December 28, 2016." Thus, before the SSA's sixty day deadline, I explained the problem: "Given the confusing and contradictory declarations in these two letters, I must conclude from the information provided by your office that I do not have Medicare Part B Health Insurance." I explicitly objected to being billed for premiums when the SSA had given me ample reason to believe that I had no coverage: " . . . I respectfully request that I be exempted from payment for health insurance coverage for the period from 1/1/17 until such time as I am informed that your

office has resolved the various confusions and contradictions in such a way as to make clear whether or not I have coverage." I concluded my argument with the following statement: "Given these extremely confusing and inconsistent letters and circumstances, it does not matter whether or not I was actually covered, since I had clear, explicit, and direct evidence from your office that I did not have coverage."

33. In this letter I made the problem as clear as possible. I politely and respectfully explained my position with respect to the clear, unambiguous termination of my coverage, my payment, and the unfairness of requiring that I pay premiums when, according to the SSA's own statement, I did not have coverage. I have maintained the same position from the beginning, despite the many offensive and confusing claims, contradictions, and mistakes of the SSA in the handing of this matter. I want to emphasize that from the first I objected to paying premiums until the SSA clearly resolved this confusion since its error caused this problem. The SSA insists even now on minimizing this issue; I will elaborate its further ramifications in due time.

34. It is significant and troubling that the ALJ again considers the only fact worth mentioning that I filed a Request for Reconsideration for "denial of medical coverage", when the substance of my request, as documented in my letter, was far more extensive and specific.

35. **Item #10**: "On April 4, 2017, the SSA advised the Appellant that he did not timely pay his Part B premium in the amount of $351.40 [*sic*—the correct amount is $317.40] and his last month of Part B coverage was March 2017 (Exh. 1, pp. 22-24)."

36. Yes, the SSA did send me this notice, which it only identified as "Important Information". The ALJ failed to note that the amount the SSA claimed I owed, $351.40, was incorrect. Recall that my total premium for the period from January through March 2017 was $402.00 dollars ($134.00/month x 3 = $402.00.) Recall also that my $350.00 payment in December exceeded the amount of the November billing, so I intended the overage of $84.60 to be applied to the $402.00 due for the first quarter of 2017. $402.00 less $84.60 equals $317.40.

37. More significantly, in this letter the SSA informed me, again, that "your medical coverage has stopped. Your last month of coverage is March 2017." The ALJ regards the SSA's letter dated April 4, 2017, as factual, yet in Item #19 of his Findings of Fact, he also identifies as a fact the SSA's claim that my "coverage continued until December 2016 with coverage terminating effective January 2017". The ALJ's recognition of these mutually exclusive and contradictory "facts" is one among many instances demonstrating that he is not in command of the facts.

38. During February, March, and into April I realized that the SSA was acting in bad faith. The SSA's April 4 letter does not mention that I attempted to make a credit card payment of $150.00. I sent the payment on February 14, 2017. This payment should have reduced my balance for the period from January to March to $167.40. However, early in March I received a letter from The Department of Health and Human Services in Baltimore, MD, dated March 1, 2017, stating that my credit card payment could not be processed because: "The credit card account number is invalid or missing." Enclosed with the letter was a copy of the payment slip (Form CMS-500) on which I had written the credit card information. The account number I had provided was correct, and the card was the same one that I had used to make my December payment. The information on the card was correct. I wrote on the letter that the number was correct. On March 13 I mailed the letter to the Medicare Premium Collection Center in Saint Louis. Near the end of March I received another letter, dated March 22, from CMS in Baltimore identical to the one I had received earlier. Again I was informed that the slip I had returned earlier in the month, with my notation that the credit card number was correct, had not been processed because the account number was incorrect or missing. I was trying to make legitimate payments, but CMS would allow me to do so. The items referred to in this paragraph are present in the records as Exhibit 1, pp. 49-51 and 53; see also Exhibit 2, pp. 5-6. The SSA's letter makes no mention and offers no explanation for its refusal to process legitimate payments. These events begin to reveal that the SSA was not being entirely forthright. Consequently,

on April 29, 2017, I submitted a second Request for Reconsideration. Oddly, my letter is absent from the record. See Exh. 2, p. 10 for a summary of my request in my description of the events of April 2017.

39. Please consider one final issue concerning the SSA's April 4 letter. In my February 21 Request for Reconsideration I had contacted the SSA to explain the problem and to request a resolution. By April more than six weeks had passed since I sent my request, and more than three months had passed since the failure to recognize my payment in December. I made one payment of $100, and I attempted twice, futilely, to make a payment of $150. The communications I received from the SSA were filled with errors and claims at odds with the facts. One might easily surmise that the SSA was being intentionally duplicitous, aiming to sow uncertainty and confusion. But instead of admitting its errors and resolving the situation, it refused completely to admit its mistakes, accept responsibility, and correct the problem. The SSA blamed me and punished me for the problem. It procrastinated in addressing the problem. It did nothing constructive; in fact, it made the situation more unclear, more confusing.

40. Consider the possibility that the SSA did not wish to solve the problem but to make it worse intentionally, to manipulate me into a disadvantageous position financially and legally, a situation that increased the probability I would make a mistake, or simply surrender to the crushing momentum of an implacable government bureaucracy. Then, the SSA could exploit its considerable advantages of resources, information, and law; for example, either taking money from my SSA benefit payments or interfering with my insurance coverage so that I would have to pay a surcharge on premiums for the rest of my life. As we advance through the ALJ's Findings of Fact, unreliable and misleading as they are, please keep in mind that the SSA has acted and continues to act in bad faith.

41. **Item #11**: "On April 11, 2017, the Appellant applied for Medicare Part B coverage beginning July 2017 (Exhibit 1, pp. 29-30)."

42. Preposterous.

43. The exhibit that the ALJ cites in support of this Finding of Fact is an "Application Summary For Retirement Insurance Benefits". This document, please note, is in the form of a template, with spaces available for an interviewer to fill in particular information. As such, the answers present on the document are subject to the interpretations and subjective impressions of the interviewer. The document divides the information presented into two categories. Those statements in all capital letters are formulae reflecting a simple, generic response or preference of the applicant to basic inquiries: name, social security number, citizenship. The second category is composed of capital letters with space available to fill in the applicant's more complex and/or personal responses, which are printed in lower case letters. Thus, this document is a representation by an employee of the SSA office in Saint Paul, MN resulting from a phone conversation with me that occurred on April 11, 2017. Note the proximity of this conversation to the SSA letter I received dated April 4. This telephone conversation consisted of a series of pro forma questions relevant to my earlier online application to the SSA for my retirement benefit payments to begin in July 2017. I do not specifically recall saying, as the SSA employee represents me as having said: "I want benefits beginning with July 2017." I am particularly dubious because I would not use the locution "beginning with"; I would say "beginning in". The SSA employee also represents me as stating: "I want to enroll in Part B of Medicare." I am also very skeptical that I made exactly this statement given that I was already more than three months into a confusing and far from resolved dispute with the SSA regarding exactly this subject.

44. To begin my objections to these claims by the SSA I ask you to consider that nowhere else in the record do I make this assertion. To the contrary, in every instance I object to it. Now the word "want" in this context could simply indicate "wish". Since my relationship with the SSA, and Medicare in particular, was so troubled, I was both wary and skeptical of the particulars of the situation. Thus, I would not have said that I "want" Part B coverage categorically and without qualification. The SSA employee did not frame his

question or delineate the context of the interview in such a way as to make clear that I might be sweeping aside all my reservations and aggravations of the preceding three and a half months. My notion of "want" in the context of this discussion was on the order of "wish" or "desire". The SSA employee did not mention any of my difficulties and misunderstandings with SSA; indeed, I suspect that he was entirely unaware of them. Thus, he was not in a position to judge that my response, if indeed it was my actual response, was absolutely unqualified. Yes, I wanted to receive the retirement benefit payments toward which I had contributed all my working life. That was to me the fundamental subject of the interview. And I had already indicated in my online application that I wanted them to begin in July, though that application had been completed weeks before.

45. It's also true that in principle I wanted Part B of Medicare. But to conflate the two statements is to misrepresent my state of mind. Remember: I was in the midst of a frustrating and suspicious disagreement covering months which had made me wary and distrustful of an organization that had caused the problem in the first place, had thus far failed completely to make any advance toward its resolution and had already made it worse, was making frequent mistakes, failing over and over to conduct its business in a responsible, reasonable way, and overall had treated me in an insulting, condescending, and dishonest manner. Why would I so casually agree to embrace without question the SSA's Part B coverage? Again, where in the entire record is there another instance of my repeating the claims the SSA attributes to me in this document—constructed by an SSA employee, who most likely did not comprehend the implications of his questions?

46. Is it possible that, determined to save face and force its will on a ungrateful and recalcitrant recipient of the its beneficence, the SSA imposed an interpretation on my responses that is more in accord with its wishful ambitions than I had any wish, desire, or intention of providing? Already I have raised suspicions about the SSA's integrity, honesty, and good faith. Here we have another instance where the SSA strives to impose

by willful misinterpretation and deceptive imagination a distortion of the actual state of affairs. I submit to you that in this instance the SSA is again cheating, trying desperately to manipulate an ephemeral remark into an admission that suits its purposes without taking into account the full context of the moment, the complexities of my state of mind at the time, or the entire progression of events.

47. The ALJ insists in his Findings of Fact that my statements in the Application Summary of April 17 constitute my application for Medicare Part B beginning July 2017. He reprehensibly distorts the meaning of the two sentences at the top of the second page (Exh. 1, p. 30). The first sentence states: "I want benefits beginning with July 2017." It does not specify that I want Part B benefits. Recall that Items #3, #4, and #5 in the ALJ's Findings of Fact all establish that I became "entitled to . . . Part B beginning July 2013 (Exh. 1, pp. 42-43, 40-41, 38-39)." Yes, in December of 2016 the SSA sent me a notice stating that my coverage had stopped. But since the reason given was that I had not paid the premium, and I knew that I had sent a payment sufficient to cover the amount due for the period from October through December, the cause of the termination was the SSA's error. Even with all the difficulty I experienced through the first three month of 2017, I believed that in the end the SSA would have to realize its mistake and reinstate my coverage to 2013. So even as I was applying for my retirement benefit payments to begin in July 2017, I still regarded myself as having become entitled to Part B in 2013. The confusion over my termination was a problem for the SSA to repair. So the second sentence, e.g., "I want to enroll in Part B of Medicare" was simply redundant on my having already become entitled in 2013. In essence, the SSA might regard my coverage as having been terminated in December 2016, but I regarded myself as entitled— continuously entitled—since 2013. And I still do.

48. Moreover, the second sentence does not say explicitly what the ALJ too hastily claims: It does not state that I want to enroll in Part B beginning in July. It only says that I "want" to enroll in Part B. No time date or time is stated. Thus, all things considered, I did not

regard myself at that time as seeking to be enrolled in Part B, whatever the SSA's misleading "errors" and "confusions" encouraged them to imagine, because I regarded myself as already so entitled. I said what was necessary to say in order that my retirement benefit payments would begin in July 2017.

49. Please note, once again, that with this item the ALJ appears disturbingly intent on claiming unequivocally that I wanted to enroll, without qualification, in Part B benefits in July 2017. For all the reasons provided in this discussion that proposition is, despite the SSA's laughable and self-gratifying insistence and the ALJ's imperious determination, demonstrably false. Yet this "request" problem returns again and again, each time with escalating vengeance.

50. **Item #12**: "On April 22, 2017, the SSA advised the Appellant that he was entitled to $1179.00 in monthly retirement benefits beginning July 2017, and confirmed that the Appellant's Part A started July 2012 and his Part B started July 2018 (Exh. 1, pp. 25-28)."

51. Note how quickly this document was delivered, despite the complexity of the information involved and processed, following the interview on April 17 and the letter of April 4. The speed at which this process was completed stands in stark contrast to the SSA's procrastination in responding to the Request for Reconsideration that I submitted at the end of February. Six weeks had passed, but I had not received a replay to my request— though, please remember—I was notified on April 4 that, once again, my Part B coverage had been terminated. Almost thirteen weeks had passed since my Part B coverage had been wrongly terminated on the last day of December.

52. But to return to the item at hand, the record now takes a dark and difficult turn for the ALJ and the SSA. The ALJ records that the SSA's letter asserted that my Part B would start in July 2018. Yet in Item #11, immediately preceding, the ALJ presents as a fact that I applied for coverage beginning in 2017. The SSA's actual statement in the letter reads: "Your Medicare Part A (hospital insurance) starts July 2012 and Part B (medical insurance) starts July 2018." So it appears, according to this letter that even if I had

wanted my Part B to begin in July 2017, the SSA had determined that my coverage would begin in 2018. Even if it were true that I "requested" that my Part B coverage begin in July 2017, the SSA refused my alleged "request". Shouldn't that be the end of the matter? Note that, though the ALJ claims that I "requested" my Part B begin in July 2017, I did not appeal the SSA's decision to have it begin in 2018. In truth, I didn't want my Part B to begin in 2017 or 2018; I regarded myself as having become entitled to this coverage in 2013, regardless of the SSA's derangements.

53. Still, the ALJ strives to salvage his unnatural romantic attachment to the notion that on April 17 I applied for Part B benefits to begin in July. He provides this footnote to Item #12: "SSA states the Appellant's Part B benefits started July 2018, but this appears to be a clerical error. The Appellant applied for Medicare Part B coverage beginning July 2017." On what evidence is the ALJ justified to infer that the inclusion of "2018" is a clerical error? Isn't it equally likely that the interviewer's use of "2017" in the document recording my Application Summary was a clerical error?

54. Other more reasonable explanations are possible. Since the General Enrollment period for 2017 (January though March) had ended, the people in charge of enrollment for the SSA realized that I would have to wait until the next General Enrollment period (January though March 2018), and thus under the requirements of the Social Security Act I could not be officially and effectively enrolled until July of 2018. Scrutiny of the Social Security Act, section 1837, provides for only three possible enrollment periods. The Initial Enrollment Period begins the third month before the applicant reaches the age of 65 and ends the third month after the month of the person's sixty-fifth birthday. Since I was sixty-nine in April 2017, when my application interview occurred (and I supposedly "requested" enrollment in Part B in July 2017), I did not qualify under the requirements of the Initial Enrollment Period. The Special Enrollment Period consists of the eight months after a prospective enrollee stops working, and it requires him/her to have group medical insurance through his or her employer. I did not qualify under those conditions.

So the sole remaining explanation appears to be that I was only eligible for enrollment within a General Enrollment Period, which is further substantiated by the SSA's decision that I would become enrolled in Part B in July of 2018. This explanation for the decision of the SSA's enrollment division is far more probable that the ALJ's desperate stab at a clerical error. Is the ALJ familiar with the provisions and requirements of the Social Security Act? Or doesn't he care what the law requires? Of course, given the SSA's history of (purported) errors, poor grammar, misinterpretations, erratic accounting, procrastination, and misrepresentation, the simplest explanation may be that the SSA just made another mistake. However, if that is the case, then the ALJ's prejudiced speculation is, again, invalidated.

55. Yet the problem of the ALJ's wishful footnote is not entirely dismissed. He has injected into his Findings of Fact an inference, based on negligible evidence at best, that is prejudiced in favor of the SSA. As the person legally, morally, and ethically responsible for adjudicating this dispute, and many others, he is required to exercise impartiality and objectivity so as to decide the issue on the merits. The inclusion of this footnote unjustifiably and unjustly favors the SSA's claims in this dispute. Moreover, the ALJ inscribes it in the section of his decision dedicated to Findings of Fact. His imaginative and subjective rationalization of a crucial and critical element of the dispute introduces a non-factual, subjectively speculative element which compromises entirely the legitimacy of Item #12 (and Item #11, which is the pretext for #12) as a fact. Clearly, Item #11 and #12 do not qualify for inclusion among the Findings of Fact.

56. Even more importantly, the ALJ's display of judicial prejudice is a grave breach of ethical judicial conduct. He has demonstrated that he is not impartial and objective; he has failed to perform his duties with the integrity his judicial responsibilities require. Earlier I alluded to indications that the ALJ at times seems to favor the opinions, claims, and arguments of the SSA while ignoring and/or disparaging my own. Here the charge is

clear beyond equivocation or excuse. The ALJ has not adjudicated this case in a manner consistent with the legal requirements and ethical responsibilities of his position.

57. **Item #13**: This item concerns the SSA's letter dated May 6, 2017, which delivers and explains its decision on my February Request for Reconsideration. Since the ALJ's remarks are lengthy, I will briefly describe the first two paragraphs of the ALJ's summary. Then I will concentrate sharply on his third paragraph. (See Exh. 1, pp. 20-21).

58. Finally, after ten weeks, I received a response to the Request for Reconsideration that I submitted on February 21, 2017. Again, how quickly, and how slowly, the SSA responds depends upon its intentions and purposes.

59. The first paragraph reiterates that on December 28, 2016, I was informed by the SSA that my Part B premium had not been paid. However, it does not explicitly note that my coverage was terminated. The second paragraph states that the SSA did, allegedly, receive my payment of $350.00 on December 29, 2018, and as a result my Part B coverage continued.

60. But the third paragraph introduces several complications. It begins: "On March 24, 2017, the Appellant paid $100 against an outstanding bill of $585.40. The SSA determined that the payment was not enough to allow the coverage to continue and the last day of Part B coverage was March 31, 2017, with an amount due of $484.40." No mention is made of my two unsuccessful efforts to pay an additional $150.00 because of CMS's repeated failures to correctly process a legitimate credit card account number. The references to the amounts due, $585.40 and $484.40, are both incorrect; the correct amounts, according to later calculations of both the ALJ and the SSA are $544.80 and $444.80 respectively (See p. 9 of 11 in the ALJ's summary of the SSA's October 29, 2017, breakdown of overages, arrearages, and payments).

61. The third paragraph continues: "The SSA notified the Appellant that the Appellant could apply for equitable relief and *if granted* it would allow continuous Part B coverage but the Appellant would still be liable for payment of all premiums that had not been paid

during that time period." (My italics.) Later, in the discussion of Item #15, I will evaluate in detail the Request for Equitable Relief that I filed on August 3, 2017. What the ALJ does not mention in his description of this part of the letter is the following sentence that precedes the passage summarized above: "If you feel that the correspondence that you received from Social Security and Medicare was confusing and caused you to not understand the billing and/or not have continuous coverage, you do have the option to contact a local Social Security office and ask to apply for Equitable Relief." This sentence is the first whisper of an indication that the SSA is subconsciously beginning to recognize its problem. The correspondence of the SSA and the absence of any information clarifying the situation did confuse me. Specifically it led me to conclude I did not have active coverage of Part B, and, most importantly, that should I need medical care my Part B coverage was inactive and unavailable to me. What if I had been injured in a traffic accident? Imagine how much more complicated the situation would have become—to the misery of the SSA and me.

62. The next paragraph of the SSA's actual letter (but not the ALJ's summary in Item #13) then states: "Even though you do not currently have Part B coverage, there is still an outstanding amount due of $485.40 [*sic*] where you had coverage but we did not receive payment. Please be aware that this balance will be deducted from your monthly benefit payment that you are scheduled to receive in August 2017." Here for the third time in just over four months, the SSA informed me that I did not have Part B coverage. Was I, as a consequence, to believe that I did have coverage? Since the SSA had caused this problem and then exacerbated it by supposedly erroneous and/or misleading information leading me to believe that I did not have Part B and in case of necessary medical care could not access it, requiring me to pay for premiums was wrong. I realize that the SSA's sentence cited above refers, incorrectly and without explanation, to the balance due for the period from July 2013 through December 2016, but the SSA was still insisting that I would have

to pay the premiums for 2017—after falsely denying I had made a payment and then refusing me coverage.

63. The fundamental difficulty with this decision on my Request for Reconsideration is that, while it gestures meekly in the direction of acknowledging my conviction that I could not use my Plan B coverage, it fails utterly to recognize that the conviction the SSA had wrongly imposed on me had the further repercussion of logically and legally requiring me to believe that Plan B coverage was unavailable to me. At this point, the SSA mentioned, sort of, that a problem may have occurred, but it was not willing to take responsibility for causing the problem or for correcting its reverberating and continuing consequences. It's also important to emphasize that I received the notice of the termination of my Plan B coverage on January 3, 2016. I received this response to my February 21, 2017 Request for Reconsideration on May 6, 2017. This decision was the SSA's first acknowledgment of the problem—seventeen weeks after the SSA created the problem; and its decision on my February Request for Reconsideration took over ten weeks. Over the course of those weeks I made one payment of $100.00, and I attempted twice, in futility, to make an additional payment of $150.00. Moreover, due to the SSA's self-serving and misleading evasions, my Part B was terminated for a third time—which struck me as paradoxical since, after the first notice of termination arrived on January 3, I had not previously been notified that it had been active.

64. **Item #14**: "On June 13, 2017, the SSA notified the Appellant that he was entitled to $1,045 in monthly retirement benefits [after the monthly Part B premium payment of $134] beginning July 2017. The SSA also noted that it changed the date of the Appellant's entitlement for hospital and medical insurance under Medicare to July 2012 (Exh. 1, pp. 17-19)."

65. This letter is the SSA's confirmation of my entitlement to monthly retirement benefits— the required institutional response to my application in April. In it the SSA notified me that I was entitled to $1045 in monthly retirement benefits beginning July 2017, payable

in August. In the section of the letter under the heading Information About Medicare, the SSA assures me: "You will still be entitled to hospital and medical insurance coverage under the claim number we have shown above." In the second paragraph of this section, it says: "We have changed the date of your entitlement to hospital and medical insurance under Medicare. Your new entitlement date is July 2012." Why is there no mention whatsoever of my alleged "request" that my Part B coverage be changed to July 2017? This new arbitrary, unexplained, and unrequested change in entitlement date supersedes the decision in the SSA's May 6 letter which read: "At this time, your record shows that you will be enrolled for Medicare Part B again during the General Enrollment period in 2018." So following the termination of my Part B at the end of March, the SSA in May stated that my coverage could resume in July 2018. But now, in its June 13 letter, the SSA declares, mystifyingly, that my entitlement date for Part B has been reset to 2012. Keep in mind that my original entitlement date for Part B was 2013.

66. At the end of the April 11, 2017, Application Summary is a boilerplate statement roughly to the effect that anyone who makes a false statement or misrepresentation of a material fact in an application commits a crime punishable under Federal law. I have shown repeatedly that in the course of the events considered and analyzed here that time and again the SSA has played fast and loose with the rules. We shall yet see such conduct again.

67. **Item #15**: I will discuss this complicated item progressively in order to present my objections as clearly as possible.

68. The first sentence reads: "On August 3, 2017, the Appellant filed a Request for Equitable Relief." The ALJ correctly notes: "The Appellant stated that he had no notice that he had Part B coverage from January 2017 to August 2017, thus he did not use his Medicare coverage." However, it would be more accurate to say that between December 2016 and the time I filed my Request for Equitable Relief, I received three separate notices from

the SSA stating that I did not have coverage, and on that basis I concluded that the SSA was denying me Part B coverage.

69. The ALJ misrepresents much of the content of the Request for Equitable Relief that I filed, with the assistance of Mr. Kong, an SSA employee at the Saint Paul, MN office. The ALJ is correct that, with Kong's encouragement, I filed this request. Included in it is a document entitled "Compromise Proposal for Medicare (Exh. 4, p. 67)". There I suggested the possibility that I <u>might</u> agree to change my entitlement date for Part B coverage. The SSA and the ALJ at times view this offer as their beloved "request" that my Part B coverage be "reinstated as of July 1, 2017". It is not such a request. The document is titled "Compromise Proposal"—it is a proposal for a compromise. My willingness to agree to the changes proposed is, as is customary in a compromise, contingent on SSA's acceptance of the conditions stated. Though I proposed this possible change, I did not "request" that my Part B coverage be "reinstated as of July 1, 2017". I was willing to accept that change only on the condition that SSA accept the other terms of the compromise proposal. Mr. Kong's formulation does state: "I am requesting equitable relief, and that my Medicare part B coverage be withdrawn from January to June of 2017, and to be re-enrolled starting July of 2017." However, I only proposed this change in the context of submitting my Compromise Proposal. I did not make an unconditional request for reinstatement on July 1, 2017.

70. The SSA's reply to my Request for Equitable Relief does not appear in the ALJ's Findings of Fact, probably because of the absence of documentation. So I will discuss it here, even though the event stands slightly out of the chronological sequence. On the afternoon of August 23, 2017, Mr. Kong informed me over the phone that my Request for Equitable Relief, including my Compromise Proposal, had been entirely rejected. I do not have a document to prove Mr. Kong's statement of the SSA's decision. In the ALJ's decision, under the heading "Procedural Notes", he records my having made numerous requests for the absent document; he also records having made, at my request, at least

two such inquiries himself. Despite these many appeals neither the ALJ nor I have received either the document or an explanation for its absence. This failure constitutes an abrogation of the OMHA rules for the adjudication of appeals. [See OCPM II-4-1, paragraph B; Citation § 405.1042.]

71. In the light of the events above, the ALJ's only correct statement thus far in Item #15 is that I filed a Request for Equitable Relief on August 3, 2017. The balance of Item #15 quotes directly the conditions of my Compromise Proposal as I stated it in my request.

72. **Item #16**: This item concerns the SSA's letter dated August 14, 2017 (Exh. 1, p. 14-16). The heading on the letter identifies it as a "Notice of Change of Benefits". The information offered by the ALJ corresponds to statements in the letter. However, when this letter arrived no context was provided for properly understanding it. Was it a response to the Request for Equitable Relief filed on August 3, 2017? Or was it a response to my second Request for Reconsideration, submitted April 29, 2017? Nothing in this SSA notice identifies its provenance. Since only two weeks had passed since I had filed the former, I was inclined to think that it must be a response to the latter—especially since my first Request for Reconsideration did not generate a reply until more than ten weeks had passed. In his "Findings of Fact" the ALJ does not resolve this confusion. (If this letter was not a reply to my April 29, 2017, Request for Reconsideration (the second), then I never did receive a response to that request.) The ALJ does note that the letter asserts that the next (i.e., the first) "retirement benefit check" I would receive would be for $790.40, the retirement benefit payment I was supposedly due for July 2017 and thus payable in August. Also, the ALJ observes that the SSA informed me that it would deduct past due premiums from my payment. However, in neither the SSA's letter nor in the ALJ's summary is it clear if the past due payments being deducted were the cause for the reduction by $254.60 of my benefit check from the standard amount of $1045 to $790.40. Adding to my confusion was the absence of any information explaining why the amount of past-due premiums apparently being withheld was $254.60. The ALJ also

writes: "The SSA also noted that the Appellant would then receive $1045.00 after August 2017."

73. Finally, in this letter the SSA recognizes: "You are entitled to medical insurance beginning July 2013". This is the SSA's fourth change to my Part B entitlement date in three months.

74. Eventually, on August 23, 2017, I learned from Mr. Kong that the SSA had seized my entire benefit check—claiming that I owed the entire $1045 for past-due premiums. Moreover, Mr. Kong informed me that he had reason to believe that the SSA would also take the entire benefit payment I was due to receive in September.

75. Following my conversation with Mr. Kong, I contacted Senator Amy Klobuchar. With the help of her assistant, Ibad Jafri, I filed a protest of the SSA's conduct over the course of the entire dispute and its confiscation of my entire benefit payment. (Exh. 2, pp. 8-17).

76. While all this information is relevant to my ongoing dispute with SSA, and my many objections to its confusing, misleading, erroneous, and corrupt practices, my point here has to do with the ALJ's misleading and deceptive oversimplification. He represents his remarks in the Findings of Fact as factual without providing any background for assessing the validity or authority of those claims. Here and at many points elsewhere in his decision, the ALJ cites information, frequently erroneous or misleading, provided by the SSA and accords it legitimacy without placing it in a context for establishing its validity. At the same time, compounding his bias in identifying the facts, he consistently ignores evidence and facts I have provided that not only challenge but often refute the claims of the SSA.

77. Finally, while it is true that SSA's August 14 letter notified me that the next check (not as the ALJ has it a "retirement benefit check") I would receive would be for $790.40, as the money due me "through August 2017", that event did not occur. I did receive that sum on September 27, 2017, following (and so not the "next") payment of $643.60 on September 14 as a refund for excess premiums—an event soon to be examined in detail in my

discussion of Item #18. The ALJ is correct to assert that the SSA's August 14 letter stated: " . . . the Appellant would then receive $1045.00 after August 2017". This sentence implies that I would receive my full benefit payment in September, which comes "after August 2017". However, I did not receive this payment, only the $790.40. So twice more the ALJ has reported accurately the actions of the SSA, but he has failed to note that the SSA's assurances were not realized in its conduct. Those failures are facts, but the ALJ fails completely to identify them. Competent performance requires consistency. The ALJ consistently fails to perform his duties competently.

78. **Item #17**: As a result of my appeal to Senator Klobuchar in early September, and the help of her assistant, Mr. Ibad Jafri, I received from the SSA another Notice of Change in Benefits, dated September 18, 2017 (Exh. 1, pp. 11-13). This letter includes another masterpiece of confusion, obfuscation, misinformation, and deception. Consider this sentence: "You will soon receive a check for $643.60 because we are refunding premiums due for medical insurance." No information is offered for how SSA arrived at this sum. No justification is provided for the seizure of my August benefit payment. The ALJ does note that the letter asserts: "SSA also stated that the next check the Appellant received would be in the amount of $643.60, which was the amount due through August 2017." Curiously, the amount of the payment for refunded premiums is identical to that for my August benefit payment. The two identical sums are not a typographical error by the ALJ; those are the alleged amounts of the two separate payments. But it does represent another confusing and misleading "error" by the SSA. Recall that in its August 14 letter the SSA stated that my next benefit payment would be $790.40 (See Item #16). From August to September the SSA apparently either doesn't know or can't decide what it is going to pay me as my retirement benefit payment. This misinformation in the SSA's letter does not receive any remark by the ALJ. As a consequence of the SSA's reckless confusions and contradictions, I was left not knowing what the SSA was going to do

regarding my benefit payment for September or what specific excess premiums were being refunded. OR WHY.

79. The ALJ concludes Item #17 with this sentence: "The SSA also noted that the date of entitlement for medical insurance was changed to July 2017 'as you requested'. " It is true that SSA's letter includes this statement. However, it is not true, and thus not a fact, that I "requested", unconditionally, that my entitlement date be changed to July 2017. Moreover, this change in my Part B entitlement date is the fifth in four months. Apparently, the SSA has the power to change entitlement dates arbitrarily and/or whimsically, but it cannot (or will not) do so if the date reflects the beneficiary's true entitlement date.

80. One last passage from the September 18 letter is relevant. The SSA writes:

81. We have corrected your medical insurance. Due to a previous error in billing [what error exactly?] we have changed the date of entitlement for medical insurance to July 2017 as you requested [objections previously noted].

82. We have changed the date of your entitlement to medical insurance under Medicare. Your new entitlement date is July 2017. We will take any premiums due for the insurance out of your next payment. [My emphasis.]

83. So according to the earlier passage, and the ALJ, the next payment I will receive, of $643.60 for refunded premiums, will be reduced by the amount due for "any premiums". What sense does it make to say that a payment for refunded premiums will be reduced by the amount due for any premiums? Or does the passage mean that the retirement benefit payment I am due to receive in September, also for $643.60 will be reduced by the amount due for "any premiums"? In both cases, the sentence underlined contradicts the earlier statements about the payments I am to receive. How am I to make sense of false and contradictory information?

84. As a matter of fact, I did receive a payment of $643.60 on September 14, 2017. But was this payment for refunded premiums or my August payment (for the money I was owed through July)? I had no way of knowing. But then on September 27, 2017, I received a payment of $790.40. This amount corresponds to the benefit payment mentioned in the

August 14 letter (well before the September letter contradicting it), so perhaps it was the benefit payment I was due in September (as payment for my August retirement benefit). This payment was seemingly reduced by $254.60 for premiums due. I was happy finally to receive these payments from the SSA. But I was not happy and not satisfied that the SSA was so unforthcoming about how and why it determined that these were the payments I was owed. The SSA's communications, as always, did more to confuse and obscure the truth than to illuminate it. Even as it attempted in its September 18 letter to explain and clarify its actions, past, present, and future, the SSA only made them more obscure and disorienting.

85. **Item #18**: The ALJ begins this section by saying: "On October 29, 2017, the SSA notified the Appellant that (1) the Appellant's Medicare Part B start date was corrected to July 2017 (Exh. 1, pp. 6-10)." But what the SSA actually wrote was: "As we told you in a letter dated September 18, 2017, we have corrected your Medicare Part B start date to July 2017, and we have refunded the $643.60 total refund you were due for excess premiums we withheld." But why did my start date need correction in the first place? Also, why is July 2017 the correct date? The SSA's formulation of this point in the September 18, 2017, letter is somewhat different: "We have corrected your medical insurance. Due to a previous error in billing we have changed the date of entitlement for the medical insurance to July 2017 as you requested." Why "corrected"? Why isn't the correct date for my entitlement to Part B the actual date on which it occurred: July 2013? And the date the SSA set it in its letter of August 14? What specific "billing error"? How does the change to July 2017, correct the problem? What exactly was the problem? No, it wasn't that you failed to honor my request. Where exactly did I make this request? (See my examination of Item #11 for my dismissal of the SSA's obsessive-compulsive delusion regarding this "request".) Every ostensible answer the SSA presents only creates more questions—never answers.

86. The most important fact in this section of the ALJ's findings is his recognition that the SSA finally concedes, however tepidly: "'due to the vague wording of that letter and no other statements about your coverage being reinstated, it's understandable that you were still unsure about your part B being active at that time.'" But in the very next sentence the SSA screws it up: "We then resumed billing of premiums, since we now had your coverage as active again." Yes, billings resumed, after notifying me on December 28, 2016 that it had terminated my coverage, but the SSA did not tell me that my coverage had resumed. In other words, after December 28, 2016 the SSA told me repeatedly that I did not have Part B coverage, but it did not tell me that I did have coverage.

87. Passing over a few sentences in the SSA's letter, the ALJ's account resumes: "Then in August 2017, the Appellant requested relief for Part B and the SSA at that time reinstated his original coverage back to July 2013 which meant he owed premiums from January 2017 to July 2017." But the ALJ is sadly confused. By employing "and" to conjoin his two sentences in Item #18 (the passage beginning with "Then, in August . . . " and ending with " . . . his Part B premiums"), the ALJ misleadingly implies that that my request for relief led the SSA to change my coverage date. But he is only struggling to reconstruct the incomprehensibly mystifying trail of the SSA's statement.

88. The change of my entitlement date was not a result of my Request for Equitable Relief; it occurred, without explanation, in the SSA's letter of August 14 that my entitlement to medical insurance had been changed to 2013. Furthermore, Mr. Kong of the Saint Paul office told me over the telephone on August 23, 2017, that my Request for Equitable Relief, including my Compromise Proposal with an offer to allow my entitlement date to be changed to July 2017, had been entirely denied. In its letter of October 29, the SSA does claim:

89. In August 2017, we received your request for relief for your Part B. The technician at that time reinstated your original coverage back to July 2013, which meant that you owed premiums for January 2017 through July 2017, which is why your full monthly payment was withheld at that time. However, per your subsequent request, we changed your Part B to reflect the original stop date of December 31, 2016, so coverage from July 2013 through December 2016, and a

new coverage period beginning July 2017. This is how your Part B coverage stands at this time."

90. Anti-grammatical gobbledygook aside, WHAT? The SSA has not—and can not— produce my alleged "subsequent request". I did not request a change in the date of my coverage in the August 3 Request for Equitable Relief (See my discussion of the Compromise Proposal in Item #15). Or subsequently. And the SSA has not produced a document substantiating one. So why the change? Does the change serve my, alleged, intentions, or does it serve the intentions of an obsessively insistent SSA?

91. It may seem a small matter, in the midst of this festering hurricane of intricate obscurity, but at a crucial moment in the surge of events, this letter intensified exponentially my confusion—as it does for the ALJ in his vain attempt to make sense of the SSA's statement. The SSA's change in the date, in conjunction with the earlier August 14 letter, contributed further to the destruction of what infinitesimal confidence I had remaining in the SSA's ability to communicate or act reasonably, rationally, or coherently.

92. Now we have reached the crux of the problem. In his presentation of Item #18 the ALJ states: "From January 2017 to July 2017, the Beneficiary had only paid $100.00 toward his Part B premiums. Thus, the SSA withheld the Appellant's monthly check." (My emphasis.) The amount of my August benefit payment was $1045 (after July's Part B premium payment). I only learned of the SSA's seizure of my check on August 23, 2017, in the course of my phone conversation with Mr. Kong. At that time he told me, as noted, that the SSA had denied my Request for Equitable Relief and that my entire benefit check for August was being withheld to cover the unpaid premiums on my Part B Medicare coverage. Why? I did not understand how the amount I owed for unpaid premiums exceeded the $1045 I was due as my retirement benefit payment. Keep in mind that in all the months prior to October 29 I had not been told that I still owed post due premiums for the period from July 2013 to December 2016. I thought the premiums due were only for January through July 2017.

93. In his Analysis section of the decision the ALJ reviews the breakdown of premiums owed and paid over the period from July 2013, when my coverage commenced, through September 2017. Using the SSA's figures (from its letter of October 29, 2017, the exhibit currently under consideration), the ALJ concludes that at the end of 2016, I owed SSA $544.80 for unpaid premiums. However, the SSA applied my March payment of $100.00 to this amount. Thus, the amount due in August for premiums prior to 2017 was, to the best of my knowledge at the time, $444.80, when SSA seized my entire benefit payment of $1045.

94. I provided to the ALJ a copy from a passage of Public Law 104—134 (110 Statute 1321—358): *The Debt Collection Improvement Act of 1996* (Exh. 2, p. 16-17). It reads:

95. (3)(A)(i) Notwithstanding any other provision of law (including sections 207 and 1631(d)(1) of the Social Security Act (42 U.S.C. 407 and 1383(d)(1)), section 413(b) of Public Law 91-173 (30 U.S.C. 923(b)), and section 14 of the Act of August 29, 1935 (45 U.S.C. 231m)), except as provided in clause (ii), all payments due to an individual under (I)the Social Security Act . . . shall be subject to offset under this section.

96. Thus far it appears that Social Security payments are subject to offset for the purposes of debt collection by the Federal government. However, the Statute continues:

97. (ii)An amount of $9,000 which a debtor may receive under Federal benefit programs cited under clause (i) within a 12-month period **shall be exempt from offset** under this subsection. In applying the $9,000 exemption, the disbursing official shall

98. (I)reduce the $9,000 exemption amount for the 12-month period by the amount of all Federal benefit payments made during such 12-month period which are not subject to offset under this subsection; and

99. (II)apply a prorated amount of the exemption to each periodic benefit payment to be made to the debtor during the applicable 12-month period.

100. An amount of $9000 pro-rated over a 12-month period is $750 per month. In August of 2017, the SSA seized my entire benefit payment of $1045. Under the provisions of the DCIA cited above, the SSA was legally justified in seizing only $295 from that payment.

Granted, the SSA could have continued to seize that amount each month until the amount

owed, as of August 2017, still not indisputably established, was repaid.

101. From my first Request for Reconsideration in February of 2017 through all my other

requests I consistently and invariably maintained, as I do now, that I should not have to

pay premiums when the SSA had told me in December 2016 that I did not have Part B

medical insurance. Furthermore, the SSA in its letter of October 29 conceded, as noted

above, and as recognized by the ALJ that: " . . . due to the vague wording of that letter

[the one dated January 10, 2017] and no other statements about the coverage being

reinstated, it's understandable that you were still unsure about your Part B being active at

that time." (Exh. 1, p. 6.) Also, by the end of October 2017 the SSA had altered my

entitlement date five times—none of which were at my request despite their fixation on

my having "requested" such a change. Moreover, I was still contesting the amount due

for Part B premiums and my original coverage date was in dispute. And the SSA still had

not stated clearly and directly that my Part B coverage had been reinstated.   Therefore,

the SSA ought to repay at least my premium payments for July and the first 23 days of

August.

102. In light of the confusion the SSA caused by its erroneous notice of termination of

coverage that I received in December and the failure of CMS to properly process my two

attempts to pay $150 first in February and again in March, the most reasonable and

responsible course of action would have been to extend my coverage until July in the

expectation that I would make additional payment. Even if I did not do so, then the SSA

would have had perfectly acceptable grounds for collecting the unpaid premiums from

my benefit payment. Instead SSA refused the reasonable and responsible course resulting

in unnecessary but continuing conflict, work, and expense for both parties. These

considerations raise an important and provocative question. Why did the SSA's actions from December 2016 through August 2017 in every instance protract and exacerbate the problem? How did these many provocations serve to advance the SSA's interests? Please reflect on how the SSA's consistently counterproductive conduct illuminates its actual interests. This situation could have been resolved quickly, easily, and completely. But the SSA refused again and again to pursue an efficient solution. This point alone is a strong indication of the SSA's fraudulent and corrupt intent.

103. Finally, please note that the ALJ concludes Item #18, for no clear reason, by stating: "However, the Appellant requested that the SSA change his Part B original stop date to December 31, 2016, so that a new coverage period would begin on July 2017." He provides no reference to an exhibit, even though he includes this remark in his list of Findings of Fact. Again, the ALJ insists that I requested that my coverage date be changed to July 2017. I did not "request" a change in my coverage date. The ALJ hammers this point over and over, but every time he claims it as a fact he is wrong. And doing wrong.

104. **Item #19 and Item #20**: I consider these two items together since the first is the SSA's February 5, 2018, reconsideration decision (Exh. 1, p. 3-5) in response to my December 10, 2017, Request for Reconsideration; the second is the SSA's dismissal of my March 10, 2018 Request for Reconsideration of that February 5 decision on the grounds that, as the ALJ notes: " . . . SSA dismissed the Appellant's April 4, 2018 [*sic*— the SSA inexplicably registers my Request for Reconsideration as dated April 4, but its actual date was March 10, 2018] because the issue was the same as that determined previously on February 5, 2018 (Exh. 1, pp. 1-2)."

105. Next, I will take up Item #20 first in order to demonstrate decisively that the SSA's ultimate decision to dismiss my March 10 Request for Reconsideration is completely unjustified. In its letter of June 19, the SSA declares: "We have dismissed your request

for reconsideration dated April 4, 2018 [*sic*—again, they can't even get the date right] because the issue is the same as that determined on February 5, 2018. Since you have submitted no new evidence, and the facts in the case have not changed, the determination we previously made is the final decision in this case." As you will see in my discussion of Item #19, contrary to the SSA's specious claims, my March 10, 2018 letter offered new evidence and additional relevant facts. As I have demonstrated repeatedly, the SSA is in no position opine dictatorially on the facts. Its dismissal of my case is the product of its multiple failures at making sense of its own errors and its unjustified and absolute refusal to admit its wrongdoing.

106. So I turn to the SSA's reconsideration decision as explained in its letter of February 5, 2018. The SSA begins by summarizing the provisions of the Social Security Act, Section 1837, governing possible enrollment periods: Initial, General, and Special. Likewise, on page 3 of 3 in the ALJ's decision un the heading "Principles of Law" he cites Section 1837, of the Social Security Act, 42 U.S.C. § 1395p: "An individual may enroll in the insurance program established by this part only in such manner and form as may be prescribed by regulations, and only during an enrollment period prescribed in or under this section." This material has been presented previously, but its utility and importance justify reviewing it here. The SSA next recounts the history of the dispute, noting that my Part B coverage began in July 2013 and continued until December 2016 "with coverage terminating effective January 2017." The ALJ, sometimes yes and sometimes no, recognizes these assertions as factual. But in the real world of actual events, my coverage did not end at the beginning of January 2017. Yet neither SSA nor the ALJ seems to realize the truth of the matter as I summarized it in my March 10, 2018 reply:

107. But in fact my coverage was not terminated in then [*sic*—my typo from the original] since I had sent a payment of $350 on December 18, 2017. I did receive a notice of

termination, but I continued to be billed for premiums from January through March. You have failed to take into account this passage in the SSA's letter of May 6, 2017 responding to my Request for Reconsideration dated February 21, 2017 (Exh.1, pp.20-21):

108.  We are responding to your Request for Reconsideration that you submitted on February 21, 2017.

109.  You had inquired about your Medicare Plan B coverage and premiums. In a notice dated December 28, 2016, we informed you that the Part B premium of $399.30 [*sic*] had not been paid which caused the coverage to end. However, the $350 payment that we received on December 29, 2016 intercepted that termination and the coverage continued.

110.  Thus, both the SSA and ALJ are not only mistaken about the facts but assert a claim that contradicts the facts. Moreover, the ALJ fails to note that in Item #10 of his Findings of Fact he stated: "On April 4, 2017, the SSA advised the Appellant that he did not timely pay his Part B premium in the amount of $351.40 [*sic*] and his last month of Part B coverage was March 2017 (Exh. 1, pp. 22-24)." Also, in Item #13, he states: "On December 29, 2016, the SSA received a payment of $350 which intercepted that termination and the Part B coverage continued." (Exh. 1, pp.20-21) So the SSA and the ALJ effectively assert that I both had coverage from January through March and that I did not have coverage during that period. My refutation of the SSA's spurious claim should count as new evidence, since it is apparently news to the SSA. As you surely know, the simultaneous assertion of a proposition and its negation is generally regarded as a symptom of mental illness.

111.  Compounding its errors the SSA in its letter of February 5 continues: "In subsequent letters, you stated you did want this coverage [as previously and repeatedly noted: FALSE]. Based on this, you were re-entitled to Part B beginning July 2017.  This is based on enrollment in a General Enrollment period as explained above. Our records

show you are currently entitled to Part B coverage beginning July 2017. This is correct." Show me a letter in which I ask for this coverage. It's not in the record. Wishing doesn't make it so.

112. No. This passage makes no sense. The SSA's earlier explanation of the General Enrollment Period is: "This period is the first three months of each calendar year (January through March)." But as already established by reference to the SSA's own correspondence, and the Findings of Fact by the ALJ, the last day of my coverage was March 31, 2017. On that date the General Enrollment Period for 2017 ended. So under Section 1837 of the Social Security Act I could not after March 31 be re-entitled for coverage as of July 2017. Again the SSA contradicts itself. On the basis of its own claims, the SSA did not previously recognize that enrollment cannot occur outside the regulations of the Social Security Act. So this information, as far as the SSA is concerned, counts as a new fact.

113. Next, the SSA turns to the subject of billings for Part B medical premiums: "In letters sent September 18, 2017 and October 29, 2017, full explanations were given of your past premium history. These letters explained the premiums that were due, were owed and were paid. These letters covered the entire issue you raised." As my discussion of Items #17 and #18 proves, those letters contained many errors. I also contend, and will soon demonstrate incontrovertibly, that the SSA still has not paid all the money it owes me.

114. Next, the SSA takes up the subject of the *Debt Collection Improvement Act of 1996*, i.e., The DCIA). "This in conjunction with the Benefit Payment Offset provision does not apply in this situation. These policies do not apply on Medicare premiums." In my March 10 response I contested this ludicrous claim: " . . . the Debt Collection Improvement Act of 1996 is not a policy, it is a statute, a law. If it were true that Medicare payments were exempt from this law, you would have to cite a provision of the law stating that fact. . . . But you offered no citation because none exists." Neither the SSA nor any other Federal

agency can have a policy that violates a Federal Statute. Furthermore, even a casual reading of the DCIA establishes that, while the Benefit Payment Offset provision allows offsets for payment, the clause immediately following exempts from offset $9000 per year, prorated over twelve months. Again, the SSA does not understanding the laws governing its own conduct. Again, to the SSA the applicability of the DCIA to its conduct is a new fact.

115. Finally, the SSA asserts: "Our previous letters explaining premiums due, paid or still owed are the final determinations on these issues. Rights to reconsideration do not exist on Medicare premiums owed, paid or due." This claim is asinine. In my March 10 letter I objected:

116. The SSA's responses regularly addressed those objections, and in September I was given a refund based on SSA's determination that billing errors had been made. Nothing in the paragraphs under the heading "Do You Disagree With The Decision?" excludes appeals regarding premiums owed, paid or due. Moreover, your statement is a contradiction. You state in your second sentence that rights to reconsideration do not exist on Medicare premiums, yet in the first sentence you recognize that previous responses to my Requests for Reconsideration regarding billing have asserted "determinations" on those issues. If no rights to reconsideration "exist" for "Medicare premiums owed, paid or due", how can it be true that SSA's responses to previous requests for reconsideration on such issues resulted in "determinations"?

117. In sum, the SSA's letter of February 5 considers four objections I raised in my December 10, 2017, Request for Reconsideration: 1)my re-entitlement date being reset to July 2017; 2)errors in previous billings; 3)The DCIA's applicability to Medicare premiums; and 4)rights to reconsideration on issues concerning premiums due, paid, or

owed. In each case I raised, and when possible documented, reasonable, plausible, and factual objections to the SSA's dismissive, counterfactual, and irrational claims.

118. In the final sentence of Item #19 the ALJ writes: "The SSA also told the Appellant that the Debt Collection Improvement Act of 1996 did not apply to Medicare premiums." He simply accepts the word of the SSA. Did he even read the Statute?  I raised the issue of the SSA's actions violating the DCIA many times in the course of this dispute. The ALJ ought to have included it in Part A of his section "Statutes and Regulations". His failure to include it there is one more serious error revealing the ALJ's absence of due diligence and his bias in favor of the SSA.

119. This section of my appeal concentrates on the ALJ's Findings of Fact. The analysis provides detailed and documented proof of the SSA's incompetence and deliberate malfeasance as well as the factual bias and erroneous and/or irrational claims in the ALJ's findings. The cumulative and innumerable errors, misrepresentations, and contradictions of both render the judgments of both unjustifiable. Both are wrong more often than they are right.

120. **Review of the ALJ's Analysis**

121. I turn now to the ALJ's Analysis (pp. 8-11 of 11) as he presents it in his decision. Having shown in the section above that the ALJ's findings are severely compromised, I will as often as possible refer to my discussion of the Findings of Fact by item number rather than redundantly repeat references to the record.

122. At the beginning of his Analysis the ALJ summarizes my requests for reimbursement. Then he takes up each item separately. I will do the same, examining as I proceed the reasoning of the ALJ.

123. **Reimbursement of Seven Months of Part B Premiums**

124. The first issue he considers is my request for reimbursement for seven months of Part B premiums. He correctly observes: "The Appellant argues that due to miscommunication by SSA he was not aware that his Part B coverage had been reinstated and that he did not use his Part B benefits from January 2017 to August 2017." Please recall that in his Findings of Fact, Item #19, he records that the SSA terminated my Part B coverage "effective January 2017"; and that in Item #10 "his last month of Part B coverage was March 2017". The ALJ has a strange concept of "fact".

125. The second paragraph of the ALJ's analysis of the issue of reimbursement for premiums from January through July asserts that with the termination of my Part B coverage on March 31, 2017, I still owed $485.40. This figure is incorrect; the correct amount is $444.80 (See the discussion of Item #13; the ALJ also arrives at this amount in his breakdown of my payments in the analysis of my claim for reimbursement of my March 24, 2017, payment (p. 9 of 11)). The ALJ also states that on May 6, 2017, "the SSA notified the Appellant that he could apply for equitable relief, and if granted, it would allow continuous Part B coverage but the Appellant would still be liable for payment of all premiums that had not been paid during that time period." (My emphasis.)

126. On August 3, 2017, I did submit a Request for Equitable Relief. Before I received a reply to this request, the SSA in its letter dated August 14, 2017, notified me, without explanation, that my entitlement date for Part B had now been changed to 2013. Oddly, in his analysis the ALJ records that: "The Appellant requested the entitlement date be changed to July 2017 because he would be liable for payment of all premiums that had not been paid if the entitlement date was July 2013." I did include in my Compromise

Proposal an objection to "incurring a penalty on my future Medicare payments as a result of the mutual misunderstandings occurring in the first six months of this year." (Exh. 2, p. 7). But this statement in no way constitutes an unqualified request for a change in my entitlement date.

127.  On August 23, I was informed over the phone by Mr. Kong, of the Saint Paul SSA office, that my Request for Equitable Relief had been denied in its entirety. Nowhere in the record is there a document containing the alleged "request" for a change in my entitlement date to July 2017 with my alleged reasons for it. (My consideration of Item #11 in the Findings of Fact largely disposes of the SSA's and the ALJ's "request" claim.)

128.  Next, the ALJ states that in its September 18, 2017, notice the SSA changed my Part B stop date to December 31, 2016, contrary to the facts already adduced by the ALJ in Item #13, and it changed my entitlement date to July 2017, with the ALJ's obligatory "as the Appellant had requested". But the SSA's September 18 letter only refers to my entitlement date being changed to July 2017; it contains no reference to my Part B stop date being changed to December 31, 2016. The reference to the change of stop date occurs for the first time in the SSA's October 29, 2017, letter on page 2 (Exh. 1, p. 7) There the SSA acknowledged, the ALJ reports: "that due to the vague wording of its January 10, 2017, letter it was possible that the Appellant would not have known that his Part B coverage had been reinstated and that he had continuous active coverage since July 2013. SSA then refunded the Appellant $643.60 for excess premiums withheld." It appears that the change in stop date, of which I was first notified in the October 29 letter was, for some reason, what enabled the SSA to refund the premiums for the period from January to July 2017.

129. The essential fact absent from this account is that, given the SSA's December 28, 2016, notice—"your medical coverage has stopped"—it would have been irrational for me to believe that I continued to have Part B coverage. Thus, I had to believe that Part B coverage was unavailable to me. Therefore, had I needed medical care at any time during the period when I believed that the SSA had (appropriately or not) terminated my coverage, that belief would have logically required me to believe that I could not use Part B coverage I had been authoritatively told I did not have. Moreover—despite my efforts to bring the error to the SSA's attention—subsequent actions by the SSA did nothing to clarify or correct the situation. Only in April 2017 did the SSA inform me that I had had Part B coverage from January through March—at the same time it informed me that my Part B coverage had stopped on March 31. So I continued to believe, accepting the word of the SSA, that I did not have Part B coverage at any time thus far in 2017.

130. Next, the ALJ turns to the SSA's Notice of Reconsideration issued February 5, 2018. In this notice the SSA, contrary to the facts (or at least some of its and the ALJ's view of the facts), recognized the stop date for my Part B coverage as December 31, 2016. But this change in the stop date of my Part B was not mentioned, as the ALJ claims, in the SSA's February 5, 2018, letter; it did occur, as previously noted, in the SSA's October 29, 2017, letter. However, it was in the September 18, 2017, letter, that the SSA reset my entitlement date for Part B coverage as July 2017, Because of these changes in the stop date and the entitlement date, the ALJ continues: "This means that the Appellant did not owe monthly premiums from January 2017 to July 2017. Moreover, because of this change in Part B entitlement to July 2017, SSA refunded the Appellant for any excess premiums that it withheld from the Appellant's monthly benefits." So the ALJ does say

that the changes made to those dates exempted me from paying monthly premiums from January to July—which implies necessarily that I did not have Part B coverage during the period. What it does not say clearly, explicitly, and definitively is that at some point the SSA did resume my Part B coverage. The implication of resumed coverage is possible, but given all the mistakes and misrepresentations and changes of the SSA, it would have been irresponsible and presumptuous of me to assume with confidence that the SSA had resumed my Part B coverage. I had had months and months, pages and pages, generating doubt about my Part B coverage. As a consequence, what I required was a completely clear and unambiguous statement from the SSA that my Part B coverage was again active.

131. Next I want to argue briefly that the SSA did not have to make changes in the stop date and my entitlement date to resolve this dispute. On page 4 of 11 in the ALJ's decision, he lays out under the heading "B. Policies and Guidance" the general policy for correcting problems, as prescribed by the Social Security Program Operations Manual System (POMS) HI 00805.170 - Conditions for Providing Equitable Relief. The statement reads: "SSA/CMS may take action to prevent or correct inequity to the individual when his/her SMI or Premium-HI enrollment, termination, or coverage rights are prejudiced because of the error, misrepresentation, or inaction of an employee or agent of the Government. The actions include (but are not limited to) the designation of enrollment and coverage periods, and appropriate adjustment of premium liability." The terms of this policy give to the SSA and CMS wide latitude and broad discretion for resolving unfair consequences resulting from exactly the sort of errors, misrepresentations, and inaction that, as I have demonstrated, caused the injustices I have endured and continue to endure. So I don't understand why all the fancy dancing over dates and stops and adjustments and

coverage periods was deemed required before the SSA could correct its many exasperating mistakes. It appears to me that the SSA and CMS had the authority all along to set the true entitlement date for my Part B coverage, exempt me from paying premiums, refund premiums that ought not to have been billed, and to tell the truth in a clear, accurate, intelligible manner. An apology would have been a good idea, too.

132. One additional critically important comment concerning the calculation of the premiums refunded is essential. The ALJ states: "This means that the Appellant did not owe monthly premiums from January 2017 to July." He doesn't say January through June. He doesn't say January until the beginning of July. January to July—seven months of premiums. Turn to the SSA's account of Benefits, Premiums, and Payments in 2017 on page 3 (Exh. 1, p. 8) of its October 29, 2017, letter. The SSA collected $134 for a July premium as part of the $402 it collected for premiums covering the period of July through September 2017. The ALJ doesn't explicitly exclude July; he seems to include it in the months for which I am entitled to a refund. Also, as I have argued throughout, I should not have been charged premiums for any period of time during which the SSA caused me to believe that I had no Part B coverage. So far in my discussion here, through its February 5 letter, the SSA has not declared unequivocally and certainly any point at which my Part B coverage definitely resumed. Eventually that declaration is made. But not yet. The SSA owes me $134 for the premium it illegally withheld in July 2017.

133. The ALJ does not address directly the second in his enumeration of my financial claims: the portion, $84.60, of my December payment of $350.00 that I intended as an advance on my premiums due for the period January through March 2017. It can be disposed of quickly. In the SSA's breakdown of premiums owed and paid in its October

29, 2017, letter (Exh. 1, pp. 6-10), the figures for 2016 show that the entire $350.00 payment in December was eventually applied to the premiums owed in 2016. I do not contest it.

134.  The kicker in the ALJ's analysis of my claim for reimbursement of premiums for the period of January to July 2017 is the following: "Therefore, SSA does not owe the Appellant any money for Part B premiums from January 2017 <u>through</u> July 2017." (my emphasis.) <u>Through July 2017</u>. The ALJ argues that the SSA doesn't owe me any money for premiums during the period from January through July because it already refunded those premiums withheld from my August 2017 benefit payment. But the SSA collected a premium for July (for the entire period from July through September, in fact; see the SSA's breakdown of premiums owed and paid in its October 29, 2017, letter) in its withholding of the August benefit payment. The SSA owes me $134.

135.  **Reimbursement for March 2017 $100 Payment**

136.  Next, the ALJ takes up my claim for reimbursement of the $100 payment I made for my Part B premium on March 24, 2017. The ALJ notes that at the end of March 2017 I owed a balance of $544.80 for premiums on Part B coverage from July 2013 through December 2016 (not $585.40 claimed at various points elsewhere the ALJ's Findings of Fact, e.g. see my discussion of Item #13). The ALJ then observes: "In March 2017, the Appellant submitted a payment of $100 which applied to this $544.80 balance." As a result this payment reduced my balance to $444.80. The SSA did not explain this transaction in its letter of September 18, 2017, so it was not clear to me. In effect, in April 2017 the SSA refunded my payment of $100.00, and applied it to the outstanding balance. Thank you.

137.  **Reimbursement of July and August 2017 Premiums**

138. The ALJ reviews my third financial claim: Reimbursement of August 2017 premiums.
What I have to say in this section applies equally to all the premiums collected by the
SSA, illegally, for the period from July through September. As he notes: "The Appellant
requested a reimbursement of 23 days of premiums for the month of August 2017
because he was 'notified of SSA's confiscation of [his] Social Security Benefits after 23
days had passed (Exh. 1, pp. 99; this document is missing from the record)." This
formulation of my justification for the claim is incorrect. I was informed on August 23,
2017, that the SSA was confiscating my entire retirement benefit payment.

139. The closest the SSA comes to stating definitively that I was not charged for premiums
during the period when it caused me to believe and act on the proposition that I did not
have Part B coverage is in its letter of September 18, 2017: "You will soon receive a
check for $643.60 because we are refunding excess premiums for medical insurance." No
mention is made of the months for which premiums are being refunded, or how the
amount of the refund was calculated, or the reason the premiums have been identified as
"excess". Only in the ALJ's decision, page 9 of 11, does what the SSA chose to do begin
to be made clear: "On February 6, 2018, SSA issued a Notice of Reconsideration which
stated the Appellant had a stop date of December 31, 2016, and new entitlement date of
July 2017 for Part B coverage. This means that the Appellant did not owe monthly
premiums from January 2017 to July 2017." Finally. However, the actual rationale for the
SSA's obligation to make these concessions occurs at the end of the preceding paragraph:
"On October 29, 2017, SSA stated that due to the vague wording of its January 10, 2017
letter it was possible that the Appellant would not have known that his Part B coverage
had been reinstated and that he had continuous, active coverage since July 2013. SSA
then refunded the Appellant $643.60 for excess premiums withheld." In this case, the
proximity of the two sentences is indicative of cause and effect: Because both the SSA's
letter of December 28, 2016 terminating my coverage and its ambiguous letter of January
10, 2017, caused me to be unsure about my Part B coverage, the SSA recognized that its

errors caused me not to know that my Part B had been reinstated—consequently, this realization compelled the SSA to accept its obligation to refund premiums it had charged me in excess.

140.  Because it is critically important, please allow me to repeat the reason that the SSA realized that it had to refund some of the money it illegally confiscated: At the end of 2016 and the beginning of 2017 the SSA led me to be unsure whether or not I had Part B. This admission of responsibility does not occur unambiguously and explicitly anywhere in the SSA's correspondence, only in the decision of the ALJ—dated and signed by him on June 28, 2019. Please keep this point in mind as it will again be relevant in my claim for refunds of premiums the SSA withheld—illegally—for July and August 2017.

141.  This rationale is consistent with the argument I presented to the SSA from the beginning: the SSA informed me, wrongly, in December 2016 that it had terminated my Part B coverage. Because the SSA did not clarify the situation despite my reasonable and timely efforts to correct its error, I had to conclude that I had no Part B coverage. In my (first) Request for Reconsideration dated February 21, 2017 (Exh. 2, pp1-2), I wrote: " . . . I should receive a refund or exemption from payment from 1/1/17 until such date as I am informed whether or not I do in fact have Medicare Part B Health Insurance. Given these extremely confusing and inconsistent letters and circumstances, it does not matter whether or not I was actually covered, since I had clear, explicit, and direct evidence from your office that I did not have coverage."

142.  Strictly speaking, on a disciplined, legalistic review of the entire record, through to the decision of the ALJ, an even more extensive claim for exemption from Part B premiums is strongly justified.

143.  It doesn't matter that the SSA has, the ALJ notes: "the ability to deduct the past due premium amount from the Appellant's monthly benefit." Ability is an entirely different matter than legality and justification. It doesn't matter that "SSA had already given notice to the Appellant that it planned to deduct the past due premium amount from the August

monthly benefits on May 6, 2017." It doesn't matter because the SSA itself repeatedly and inexplicably changed my entitlement for Part B coverage; failed to inform me that when the date was changed to July 2017 that I would [no] longer be required to pay premiums for the period when the SSA itself caused me believe I had no Part B coverage—until the SSA began to re-evaluate the situation in September, following my appeal to Senator Klobuchar. Funny how that happened. Also, keep in mind that in August the SSA illegally confiscated my entire benefit check of $1045, and then in September it withheld an additional $254.60. When in fact the amount I had cause to believe I owed in premiums was only $444.80.

144. One final complication remains. The SSA's letter dated October 29, 2017, provides a "breakdown of all premiums owed and paid from July 2013 through September 2017." On the third page of this letter (page 8 of Exhibit 1) near the bottom is summary of payments the SSA claims I received during the months of July, August, and September. The SSA's record shows total benefit payments for July through September as $867.60. Under "Amount Paid" for the month of August is "[$] 77.20". I never received this payment. I received no payment in the month of August. I have my bank statements for the months of August and September, and I am providing them to you with this appeal. They show no payment for $77.20. So $77.20 must be subtracted from the SSA's claimed total of $867.60—the result is $790.40, which is the amount I received on September 27. So $77.20 must be added to the money the SSA still owes me. Therefore, the total I am owed by the SSA is $310.56.

145. **Other forms of relief**

146. The last topic the ALJ reviews is my request for relief in the form of compensation for costs imposed upon me by the SSA's unjustified and illegal capture of funds from my August and September retirement benefit payments in the course of my pursuit of a just conclusion to this dispute. I have asked for $10,000 to cover my time and expenses. Had I sought the assistance of an attorney, the cost would have been far greater.

147. At the time the SSA withheld my August retirement benefit payment, I had to get a loan of $1000 to pay my rent and other bills. That loan was not fully repaid until July 2018. In addition, I had to borrow money from friends to make sure that I, my son, and my partner had food to eat until the SSA delivered the refund for excess premiums. These costs were the direct result of the SSA's errors of action and inaction. Moreover, they are not merely needs and hardships but the very necessities of life. Without this essential financial assistance, the consequences of the SSA's misguided and malicious actions for my family and me would have been disastrous.

148. The ALJ claims, without explanation, that neither he nor the OMHA has jurisdiction for ordering such a payment. As I have shown many times in the preceding pages, the ALJ often jumps to conclusions as a result of in errors of judgment, fact, and law. Not to mention judicial obligation and conduct. Let me suggest that in this instance he is, once again, wrong. I believe you already realize that this case out of the ordinary. Consideration of C. F. R. § 405.1006(d) may provide legal authority for additional relief. Please consider granting me remuneration for harassment and statutory misconduct, as well as financial duress and personal affront, that the SSA unnecessarily and recklessly inflicted upon me for more than two and a half years.

149. **Benefit Payments, Refunds, Part B Premiums, Money Withheld**

150. Before concluding I want to review the financial record to assess the extent to which the issues raised during the course of this dispute have been resolved by the Medicare Appeals Council. I maintain, and I will prove, that the SSA owes me money still. Also, please consider that as a matter of policy, as the ALJ notes on page 5 of his decision: "Relief cannot be provided under this amendment merely because of hardship or because of 'good cause' for failure to enroll. There must be some erroneous action or inaction by the Government which is prejudicial to the rights of the individual." I have demonstrated above, not merely by a preponderance of the evidence but far beyond a reasonable doubt, that the Government, in this case the SSA (and the ALJ) by its (and his erroneous

conduct acted with prejudice to my rights. The SSA has admitted its culpability (up to a point), and the ALJ has (up to a point) affirmed it.

151. So I present the specific amounts the SSA owes me:

152. July 2017 premium—$134.00;

153. August/a minimum of 23 days—$99.36;

154. False claim of payment for August 2017—$77.20;

155. The total of these claims is: **$310.56**.

156. Based on the record these discrete and clearly identifiable claims are entirely justified. As I remarked above, I could easily and decisively argue that the SSA's unwillingness and inability to act appropriately for so long, as the record makes abundantly clear, justifies an extension of the period for which I should be exempt from premium payments. Also, I hope that the Appeals Review Board will give serious consideration to remunerating me for the damage and expenses imposed by the arbitrary and reprehensible damages unnecessarily and illegally imposed upon me and my family. I will leave it to the judgment of the Appeals Review Board to consider the full record in a determination of a just determination of relief for the injustices imposed by the irresponsible, dishonest, and illegal actions of the SSA.

157. One last item requires attention. In my initial letter to the OMHA requesting an ALJ hearing on this matter (Exh. 3, pp. 4-7), I stated that among the acts of relief I sought was: "Reinstatement of my original enrollment dates in Medicare Parts A and B as 2012 and 2013, respectively." This sentence appears on page 7A of the exhibit. Under the policy guidance of POMS the SSA has the ability and the legal authority to make this change. Those dates reflect the actual events when they actually occurred. The truth matters. The SSA caused all this confusion. Even a single particle of genuine truth will benefit the maelstrom of chaos wildly colliding in the SSA.

158. **Procedural Anomalies**

159.  A number of irregularities should be recognized for a thorough assessment of my appeal. I have had cause in the course of this statement to mention on several occasions that documents are missing from the record. First and foremost, the SSA has not once responded in any form to approximately nine requests from me, and at least two by the ALJ, to produce the document recording its decision on my Request for Equitable Relief. As a document used in making the decision under review, it is essential to the administrative record. The SSA's failure to produce it is a violation of OMHA Rules in accordance with §405.1042.

160.  I must also mention that a number of documents I provided to the ALJ do not appear in the record. Included among these items is 1)a list of six letters absent from the record that I had previously mailed to the SSA; 2)copies of all the letters identified in the previous item; 3)an updated statement of the financial relief I desired eventually to receive from the SSA; 4)examples of various dismissive responses I received from the SSA to my efforts to provide them with Responses to Notices of Hearing, my correspondence with the OMHA, and my requests for the report on the decision on my Request for Equitable Relief. I sent this material to the ALJ by certified mail on April 15, 2019. I have the certified mail receipt and the postcard certifying delivery of this mail on April 19, 2019. I am enclosing it with this appeal. Nevertheless, the documents I sent then do not appear among the exhibits in the record. Moreover, in the copy of the record that I received from the ALJ Exhibit Four is incomplete. The highest page number I have is "79". But in the Analysis section of his decision the ALJ cites documents numbered "99" and "100". So my copy of the record, apparently, does not include at least twenty pages. More may be missing, but I don't have time now to check every page in the entire record. My point is made.

161.  Finally, please note in particular that the ALJ did not include a copy of the *Debt Collection Improvement Act of 1996* among the essential "Principles of Law: Statutes

and Regulations" relevant to the case. This oversight reflects an error of judgment and procedure by the ALJ that is prejudicial to my claims that the SSA violated the law.

162. I accept the rules, and I have tried to act in accordance with them. The SSA and the ALJ act as if for them the rules must sometimes be regarded as an irrelevant distraction.

163. **Conclusion**

164. I have no illusions that you will decide this case in my favor. I know you have seen similar cases many times. The SSA only acts in this manner because it was deeply confident that the machinery of appeals will sustain it. I'm sure that among the people employed there and perpetrating these deceits are comforted by a self-deception that provides a soothing blur of exculpation: The game goes on as it always has. This is justice. That's all. It's a job. I'm just doing my part, doing as I'm told. It's a living.

165. The corrosion of government, anywhere, accumulates in precisely this way. Identifying the clients as the enemy. The suckers. Then it's easy to rationalize away the rules and the law, except when it's advantageous to twist them to your purposes.

166. So the con continues, over and over, the countless repetitions bestowing the comforting hypocrisy of "This is how it works." "This is how it goes." "That's life." The progress of legal and moral erosion is obscured by the hazy comfort of smug superiority that accompanies the bittersweet success of getting away with it. Enjoy the thrill because it can not last forever. The greater, enabling architecture that for now enables and conceals you, your manipulations, your duplicity extends far beyond your specific function. Without intervention, eventually, inevitably, corruption self-destructs.

167. **Appendix**

168. General Policy: SSA/CMS may take action to prevent or correct inequity to the individual when his/her SMI or Premium-H1 enrollment, termination, or coverage rights are prejudiced because of the error, misrepresentation, or inaction of an employee of an employee or agent of the Government. The actions include (but are not limited to) the

designation of enrollment and coverage periods, and appropriate adjustment of premium liability.

169. Requirements for Equitable Relief: The elements that must be present in each case where equitable relief is granted are:

170. a)Government error, misrepresentation, or inaction—Proven

171. b)Prejudice to the individual's SMI or Premium -HI rights—Proven and Acknowledged by the SSA.

172. c)Evidence of the error—Documentary Evidence Submitted.

173. Prejudice to the SMI Rights: Prejudice to the individual's rights may consist of:

174. a)carrying private insurance he/she did not need—not applicable.

175. b)electing surgery in advance of entitlement because he/she was misinformed about the entitlement date—not applicable.

176. c)missing an enrollment date—not applicable.

177. d)inability to pay a large premium which accrued due to Government delay—Proven.

178. e)Any other hardship with health insurance or health care needs that is traced to Government error, misrepresentation, or inaction on enrollment, premium collection, or termination of entitlement—Documented—Overwhelmingly.

179. What the evidence must show: There must be evidence meeting the definition in HI § 00805.175 which shows that:

180. a)the individual took such appropriate and timely measures to assert his rights as could reasonably be expected under the circumstances—Proven

181. b)because of administrative fault, delay or erroneous action or inaction by an employee or agent of SSA/CMS or another Federal Government instrumentality, the enrollment or premium rights would be impaired unless relief is given—Proven.

182. <u>Substantiation of alleged errors</u>: The individual may allege that his/her rights were prejudiced due to misinformation received. Such allegations must be substantiated— Proven.

183. <u>Required documentation</u>: Equitable relief may not be granted unless the file contains documentary evidence. <u>The evidence can be in the form of statements from employees, agents, or persons in authority that the alleged misinformation, mis-advice, misrepresentation, inaction, or erroneous action actually occurred</u>. In the absence of such personal knowledge, the evidence can consist of a statement that there is a strong likelihood based on personal knowledge or prior experience that an error occurred— Provided. A Decisive Preponderance of the Evidence—Provided. Beyond a Reasonable Doubt.

184. **A Cursory Response to the Decision of the AAJ**

185. Paragraphs #7 through #184 are a slight revision of the appeal (submitted in August of 2019) that I presented to the Administrative Appeals Judge (AAJ, Debbie K. Nobleman) for Medicare Appeals Council in regard to the decision of my initial appeal to the Administrative Law Judge's (ALJ, Kevin H. McCormack) earlier decision, dated August 28, 2019. I have proofread it for errors of grammar, punctuation, paragraph numbering, and spelling, but no significant changes have been made to the content. I have at points in the text underlined specific passages for emphasis. This document provides a detailed and substantiated account of the events following the unjustifiable termination of my Part B Medicare in January of 2017. I am assuming that you have (or will have) the official record that accompanied the appeal to the AAJ. All documents cited and/or referred to are included in the record except those that the SSA failed to provide despite many formal, written requests (and are explicitly noted as such in the text).

186. I provide this extensive account in my complaint because it is the most complete and accurate description of events that occurred during the period from September 2016 through 2018. It is a full, detailed, and, as fully as possible, documented account of the

malfeasance of the SSA. Moreover, it contains my analyses, justifications, and specific legal objections to the SSA's conduct. I hope that the comprehensive detail of this complaint will prove that the long way round is sometimes the short way home.

187. I do want to mention that evidence has recently come to light regarding SSA's alleged payment to me in August of 2017 of 4 (See paragraphs 145 and155). It may be that the payment was made, but it has not yet been decisively established. The matter requires further investigation. If the evidence proves valid, I will inform the court.

188. Next, I consider the decision of the AAJ (dated October 18, 2021) which this appeal, and my complaint also address. The AAJ has ruled in her opinion that my requests for reimbursement and relief are rejected. I contest the AAJ's assessment of my appeal, her misguided evaluation of the record, and her unjustified conclusion.

189. After a brusque exercise in lip service to the insults the Appellant endured from the SSA, the AAJ states on the first page of her decision that: " . . . the appellant has not demonstrated that he is due additional equitable relief beyond what has already been provided by the Social Security Administration." The essence of the AAJ's argument, upon review of the record, is on p. 4 of her opinion: "Thus, we find the record does not support any error, misrepresentation or inaction by the SSA or other Federal agent regarding the appellant's Part B enrollment beginning in July 2017 or any resulting prejudice to the appellant." I have already provided above a meticulous recounting of the record. I don't doubt that the AAJ under stand the meaning of the words "error", 'misrepresentation", and "inaction", but she is apparently unable under the circumstances to apply them to the behavior they denote. The record is an accumulation of countless acts of error, misrepresentation, and inaction—note to mention confusion, deception, and violations of policy, statutes, and common sense. I will identify here a few of the most obvious misunderstandings, misconceptions, and biases, present in the AAJ's opinion.

190. First, she finds, on p. 1, "the record to be complete." As noted earlier, despite many requests for documents, the SSA failed to provide several essential items. Where in the

record is the SSA's denial of the Appellant's Request for Equitable Relief, filed on August 3, 2017. The AAJ claims that the documents that the Appellant claims are missing are in fact in the record—"*Compare* Exh. 4 at 79, with Exh. 1 at 6" (opinion p. 2). Exh. 4 at page 79 is a letter from the ALJ ( a second request to SSA's Mid-America Program Center for the document explaining the denial of the Appellant's Request for Equitable Relief. Exh. 1 at p. 6 is the SSA's letter of October 29, 2017 stating that a technician reinstated the Appellant's coverage to 2013. But no explanation or justification is offered for that reinstatement. Please note that the ALJ never made this particular point. Furthermore, as noted in paragraphs 69 and 79 above, no such "request" was made. The citations offered by the AAJ are insultingly irrelevant. Yet the AAJ concludes by dismissing the Appellant's criticism of the record: " . . . we find harmless the SSA's seeming lack of response to the ALJ's request." The AAJ can't convince so she chooses to confuse.

191. Next, the AAJ observes, " . . . to the extent that the ALJ may have made typographical errors or the ALJ's finding's of fact may not have reflected the appellant's interpretation of the events or the law, or to the extent that the appellant has misunderstood or misinterpreted the ALJ's summary, those errors are harmless as they do not change the outcome of this appeal." Consider carefully the AAJ's employment of the locution "those errors are harmless". Is the AAJ referring to the typographical errors mentioned at the beginning of the sentence? Or is she pointing to her, unspecified accusations that "the appellant has misunderstood or misinterpreted the ALJ's summary"? She offers no examples to substantiate her claims. In either case. Clear communication requires clear thinking. The AAJ doesn't know what she thinks. Crucially, this problem recurs frequently throughout her opinion. Please note that in my original appeal I did not refer to the AAJ as making typographical errors. I did, however, discuss in detail the ALJ's presumptuous and unsubstantiated conclusion that a claim by an SSA correspondent was merely the result of a clerical error (paragraphs 53—55 above). Thus, the AAJ, like the

ALJ, is not in command of the facts. Instead she chooses to play fast and loose with the truth.

192.  I am not going to waste time and effort (yours or mine) exposing every flaw in the AAJ's rhetoric and reasoning. I will make a few general remarks and trust that the AAJ's obfuscation and dissembling will be clear to the court. The AAJ consistently fails to provide context for many statements and events mentioned in the Appellant's initial appeal. As often, or more, she misinterprets or erroneously describes matters of fact established in the record. For instance, the AAJ refers to "the appellant's request that he be enrolled in Part B beginning July 2017" (opinion, p.3). Here the AAJ has illegitimately adopted the false notion of the SSA and the ALJ that the Appellant's offer of a compromise agreement between himself and the SSA  constituted by itself a "request". This fictional "request", which was in fact a proposal for a compromise did occur in a Request for Equitable Relief, but the proposal itself was merely an offer, not a "request". This issue is dealt with extensively and decisively in paragraphs 69 and 79 above.

193.  Furthermore, the AAJ fails completely to address the SSA's documented failure to comply with the DCIA, the SSA's policies as stated in the Program Operations Manual Systems 00805.170, and various Statutory Requirements cited in the Appellant's initial appeal (paragraphs 79 and 80). The AAJ claims that the Appellant's appeal has been reviewed *de novo*, yet the AAJ depends almost entirely upon the judgments and interpretations of the ALJ, often without (accurate) reference to the record. The AAJ ignores large portions of the Appellant's appeal. In a final insult, she opines: " . . . other than indicating that he has suffered financial duress and personal affront, the appellant does not identify the specific harms he incurred." Apparently, she missed those many items.

194.  The AAJ's opinion is an amalgamation of confusion, irrationality, irresponsible and unfounded accusation, carelessness, prejudice and illegality. She has served her SSA employers determinedly but disastrously. The judgments of the Administrative Law

Judge and the Administrative Appeals Judge should be dismissed summarily as insults to and abrogations of justice.

195.  One final observation is essential to a just consideration of the conduct of the SSA and the Medicare Appeals Council. I point to a recent event that is emblematic of these two institutions' vindictive, fearful, and illegal behavior. I received the AAJ's decision on October 23 of this year. In the letter accompanying the AAJ's decision I was informed that I had 60 days to file an appeal. Included was this information: "If you cannot file your complaint within sixty days, you may ask the Council to extend the time in which you may begin a civil action. However, the Council will only extend the time if you provide a good reason for not meeting the deadline. Your reason must be set forth clearly in your request (42 C.F.R. 405.1134) On November 7 and again on November 12 I sent certified letters explaining my reasons in detail and requesting additional time to complete this appeal. The deadline, in accordance with the date that the AAJ's opinion was mailed (October 18) is December 23, two days before Christmas. As of December 16, my request has been neither approved nor rejected. I have heard nothing from the Medicare Appeals Council. I propose to you, based on my past experience, that no matter how compelling and persuasive the reasons I might provide, the MAC would deny my request for addition time to appeal.

196.  As a consequence I have had to work long and hard to complete this document in the time dogmatically prescribed by the MAC. I apologize that it is nowhere near as concise and convincing as I want it to be. I have done my best under the circumstances. Thank you for your consideration.